Ladies and gentlemen, our first case for argument, Pileco v. Slurry. Mr. Peck. May it please the Court. In his December 11th opinion, Judge Keyes wrote, if it had been in the Court's power to salvage the first verdict, I would have done so. On appeal, if the Seventh Circuit determines that this Court's reasons for ordering a mistrial were wrong, it can take that path. But that's a move for the Court of Appeals, not for this Court. We suggest that that actually is the proper course here. The Court below ordered an entire retrial of both cases, the case that SSI, Slurry Systems, Inc., fought against Pileco and Bauer, as well as the Pileco-Bauer case against SSI. No issue was raised regarding liability or even the compensatory damages on SSI's claims. Now, this Court has instructed the district courts that only in an unusual case will a court order a new trial on liability because of an error in assessing damages. There was no objection to retrying the case, so this argument has not been preserved. It was fully preserved, and first of all, it seems clear from this Court's precedence that the issue of an order retrying it sua sponte is eligible to be raised on appeal when you're appealing the final judgment. I don't question that, but the issue was not preserved. No one objected to the retrial, and in fact, everyone agreed to it. The decision to set the case for retrial occurred two months after the jury's verdict, at which time the jury was discharged. No, I understand that, but the judge gave everyone ample notice that he was considering this course. There was nothing on the record because this occurred in chambers. So there is no objection on the record to the retrial? There is no objection on the record. So why should we consider it? Because, again, this was an objection that was made. There was no court reporter to record it, and this was a surprise. This was a surprise. The Court ordered the parties to try to settle the case. When they could not settle it, he said, I am ordering a new trial, but we also didn't have the grounds on which he was doing it. He said that there was a problem with the jury, but then he issued his opinion. The danger in this kind of a situation, if we were to consider the issue without an objection on the record, is that parties would, in essence, be allowed to gamble on the outcome, avoid making any objection in the hopes that the second trial would turn out better than the first. Well, in this case, the trial turned out very well for my client. They had no reason to want to retry it over the possibility that what eventually became $350,000 would be added to their damages. Right, but we're not framing the rule for just one case. I understand that, Your Honor, but I also think that the situation is somewhat different from the typical interlocutory order, and that is because here you have an instance where it's very much like a motion for rehearing. There's no need to seek a motion for rehearing. You have a judge who has made the decision on their own. They're forcing the retrial on you. It's clear that they're not going to change their mind for reconsideration. No, there was ample opportunity to object. There was ample opportunity to object, number one, to the retrial itself or to the scope of the retrial. If you didn't want a full retrial, you could have asked for a retrial on damages only. None of that was done here. The retrial proceeded without a peep from anyone. Well, as I said, there was more than a peep from you. Nothing on the record. I understand that. But here, again, this was an error of law. This was an error of law where the judge— It doesn't matter if it hasn't been objected to. If the issue has not been preserved, it's gone. And there was no opportunity, as the judge said, he was not seeking—he was not allowing post-trial motions. So the question becomes, how do you object in that instance? How can you not allow post-trial motions? Well, the judge's opinion makes that clear, that he did not because he was ordering a new trial and we were all to prepare for that. Sure. And you should do that. But if you think your legal rights are being violated by a district judge, we expect counsel to have enough spine to stand up and object. What's wrong with that expectation? Again, it was only after receiving the opinion that we knew the grounds on which he was going to— So you see those. You think there's a mistake. You tell him so, right? Rather than go through another whole trial and then disappeal. Clearly, that was conveyed. There were attempts in trying to formulate a new trial that also relied and tried to use the first trial because, again, there were no questions about liability. This was plainly a strategic decision on the part of—it was different counsel below, but on the part of counsel below to retry the whole case so that you could get a compensatory damages award on the consumer fraud action and a large punitive award. You know, Judge Keyes wrote in his opinion that he thought it was a strategic decision because we didn't settle. But, of course, it takes two to settle. It wasn't that we were unwilling to settle. It was a strategic decision to take a chance on a better outcome in the second trial. You know, again, we were perfectly fine with this outcome. There is no way that any outcome would have been tremendously better. If that was so, then you could have sought to preserve it by objecting to the new trial. Again, I think that this is very much like a request for rehearing that is unnecessary before you appeal. You say the district court failed to suggest, let alone consider, a remittitor. Did you ask the judge to do that? The judge was asked for all sorts of— Did you ask the judge to do that? Yes, and in the December 11th opinion, he talks about that. He talks about—he said that, you know, that would not respect the jury's decision. He was insistent that we had to go to a new trial. He even indicated that, you know, he would have come out in the second trial differently than the jury. In this instance, the fact is the second trial was flawed for many of the same reasons that he claimed the first trial was flawed, only it was more egregiously so. The jury did not show its calculations on equitable adjustment, which he found to be a key flaw in the first trial. There was—he wrote that the same trial, the same case was presented by SSI before the court, and that as a result of presenting that same— Well, the judge—one of the things—the jury had awarded punitive damages without compensatory damages. The judge had to correct that, didn't he? He had to strike that, and he had to do that under Illinois law. But he was under the misimpression that he had to go through a BMW v. Gore type of analysis, which was unnecessary in this instance because the claim was— the claim which was the only one eligible for punitive damages was ineligible because there were no compensatory damages. Yes, but the jury had done such a goofy thing, right? Doesn't that cast doubt on the competence of the jury? I don't believe it does. I think that this was—you know, this was not a finding of fact under Cooper v. Leatherman, but an expression of moral condemnation for Pilokot's behavior, and as that, all it could do was indicate that fact. But as we know under Cooper v. Leatherman, the court is fully capable of disallowing the punitive damages and accepting the rest of the verdict. Wait, I don't understand what you're saying. Again— The award of punitive damages was wrong, right? Yes. Yeah. And it suggests that the jury wasn't thinking when instructive or what? You know, I think— The unusual error. I think the thing is that they were confused because they also awarded a breach of warranty, breach of merchantability, and all those different claims, so that perhaps— Well, if they were confused, why wouldn't that be an adequate reason for a new trial? I don't think it was a good reason to try the case entirely anew. Again, there were no questions about liability. The judge raised no issues with their determination that there was no award under the Consumer Fraud Act, or any question about the other— But what was the jury thinking when it awarded no compensatory damages but substantial punitive damages? We can only speculate, obviously, because the jury was discharged immediately and told that he was entering judgment on the verdict. But I think that the jury looked at the consumer fraud issue as duplicative of the merchantability and warranty issues, and therefore thought they could award the punitive damages. Well, in fact, the jury sent a question out during deliberations that indicated it was confused about this special verdict form and the interrelationship between these different claims and which direction liability ran to. And I think it's very clear the jury was confused across the board based on this verdict. They fined PILOCO on its breach of contract claim but awarded this flat $2 million in damages. It's unclear where that's coming from. Well, that's precisely what the second jury awarded as well. They found in favor—I know, but the way that this verdict form was crafted invited the kind of confusion that we got in both the first verdict form and, to some extent, the second verdict form because some of the errors were repeated. Who prepared the special verdict? I'm not aware of who did that. All I know is that no party objected to it. See, wasn't the problem that the judge didn't interview the jury about its thinking? Yes, I believe that is— But having made that mistake, did he really have a choice? Didn't he have to have a new trial? Once the jury was gone, right, he couldn't do anything. Again, I think he had an obligation to harmonize the jury's verdict with a judgment and that he had adequate tools to do so. No, this verdict cannot be harmonized. It's an internally inconsistent verdict, the first one, to find that both sides breached the contract and come up with these damages amounts that make no sense based on the evidence in the case and then these arbitrary numbers on the breach of warranty claims and then add to that the no compensatory damages verdict on the consumer fraud claim with a $20 million punitives award. It's completely inconsistent. It doesn't make any sense. I don't know how you would reconcile this. Again, I think that you reconcile it simply on the basis of the fact that there were mutual breaches and one breach was of a greater damage than the other. Well, right, but the jury was obviously confused about whether the breaches excused performance on one side or the other. I don't know what theory on which this case was tried. I don't know whether the jury had to decide whether... Counsel, if you could let judges finish their comments and questions, it would be helpful. I was unable to determine from the briefing in this court on what theory the mutual breach claims were tried and without going back in and reading the closing arguments of counsel, I wouldn't be able to discern that, at least not from what we were given in the briefs in this case, but it's very clear to me based on looking at the verdict form that the jury was hopelessly confused about what it was supposed to do with the mutual claims of breach, the claims of breach of warranty, and the Consumer Fraud Act claim, and the damages amounts don't stack up or don't make any sense in context. Let me simply suggest that the jury awarded past rent due, but then awarded to SSI, its damages for the fact that we had a machine that did not perform as expected, that was not new as it was supposed to be, and that it constantly could not be repaired, and so the job took more than twice as long as it ought to have taken. Right, but what evidence anchors these numbers? There was no effort to address that in any of the briefing in this court. Now I see I've entered my... Could you say something about, I don't understand this business about the cutter was old or something like that? Yes. What's that about? The contract, as signed by both, required a new cutter because this was a rent-to-own agreement. Required a what? Keep your voice down. Required what? Required a new cutter because this was a rent-to-own agreement, so they were looking for a brand-new cutter, and it was during the course of discovery, the B-tronic records, which are the electronic records kept in the cutter itself, revealed for the first time that it had been in operation for two years before it arrived at the job site. So as a result, it was not a new cutter. It did not meet the contract's requirements. Inexplicably, in the brief before this court, Pyliko tells you that it was new, despite that evidence and despite Judge Keyes writing in his December 11th opinion that it was not new and that it was at least two years old at that point. I don't understand why they make that assertion, but that was a key requirement of this project. Well, as a result of its being two years old, had it aged in the sense that it wasn't as good? We believe that that is the case. How was it being used in those two years? It was used for precisely the kind of projects that this was. It was used to dig and to help create these slurry walls. And so you think that it got worn down and defective and so on as a result of this? Clearly it did not perform. That may have been one of the reasons it did not perform. What is the normal life of these cutters? I don't know. I don't know what the normal life is. But we do know that because they had contracted to purchase this if it had worked successfully, every expectation was that they would be supplied with a brand new cutter, not one that had previous problems. Was it inspected to see whether it had deteriorated over its two years? Again, the B-Tronic records are the only way you could tell. Thomas Stocker, the mechanic who for decades... What do you mean it's the only way you can tell? Excuse me? Why do you say it's the only way you can tell? Visibly you cannot tell. Thomas Stocker, who... Well, I don't understand you. If the cutter is worn down, for example, that obviously can be determined. If its edges get dulled, right? Slurry systems contracted for new teeth on there so that they had new teeth to help dig. But the fact of the matter is their expectation was a new cutter. That was the key part of the agreement to them. As I indicated, Thomas Stocker, the... Look, if the machine, despite its age and violation of the agreement and being old, if it hadn't deteriorated at all, there wouldn't be any harm. So my question is, what is the evidence that it actually had deteriorated and therefore that the problems that you ran into were attributable to its having age? Well, Bauer's own mechanics put the machine together on site. It failed immediately. How much does this cutter cost? This is a 40-metric machine. It's extraordinarily expensive. How much does it cost? I'm forgetting from the evidence what that amount is. Okay, look, this huge piece of machinery that is very expensive, that doesn't wear out after two years. Now, it could be a defective machine from its birth, right? It could have been. It's not going to wear out in two years. But as I indicated, it wasn't until discovery that they learned that they had not gotten the machine they expected. Okay, so it was old. Maybe it was old. The question is, is there some harm? We believe that that was a factor on why it was deficient. Well, what's the evidence that its age, that this rapid age of this machine was responsible for the problem? The testimony was unclear whether that could have been a factor of age or other deficiencies. But I submit that it is. Other deficiencies are different from. I mean, you keep insisting that it had to be new. And my question is, even if it's old, if it's functioning as well as it did when it was new, then I don't see what the harm is. But here it was not functioning. Yes, but why wasn't it not functioning? That's the question. Do we know? We don't have a definitive answer, but the fact that it didn't function is enough also to be a breach of contract. But you haven't connected its not functioning with its being old. You say the breach was giving you an old machine, okay? But if age had nothing to do with its deficiencies, you'd need a different theory as to why you were wrong. Except that if we were going to act on the part of the contract that allowed us to purchase the machine afterwards, that we wanted a machine that had not been used by others beforehand. And so that aspect of the contract was a substantial portion of it. And I think that that warrants consideration as a breach of the contract. Mr. Peck, can I ask you to clarify something? As I understand it, these electronic records showed some use two years earlier, correct? Use over that period of time. Did they show how much use over that period? Yes, they do show how much. And what did they show? It was substantial. Can you quantify it? I cannot quantify it for you here, but the record shows that it was substantial. It was a surprise. It caused trial counsel to file an amended complaint to indicate that this was a breach of the agreement. Okay. Well, thank you. Mr. Peck. Mr. Eaton. Oh, are we supposed to? Are you going to talk right after, Mr. Peck? Excuse me. I can't hear you. I'll talk on rebuttal if the court has any questions relating to the Miller Act issues in the case. That's fine. Thank you. Thank you, Judge. Yeah. So, Mr. Eaton. Good morning, Your Honors. Tim Eaton on behalf of Pop Column Bauer, the Appellee. Let me just start by answering some of the questions, some of the points that were made through your questions, and I can respond to them. First of all, you're absolutely right that there was no objection given by SSI with respect to a new trial. We acquiesced in the new trial because we didn't like the first one. We didn't like the verdict, obviously. Judge Keyes indicated right off the bat he didn't like it either. In fact, in his ruling he said the court and the parties immediately realized that the verdict was problematic in a number of ways. He indicated two. If I'd had a chance to file a new trial motion, I would have indicated a number, but he had already ruled in our favor, so why should we file anything at that point? But the two that he identified was that there was no equitable adjustment made to the rental price, which was what we were seeking in our contract claim, and that there was no compensatory damages, as this court is aware. I'm a punitive. There also were a number of problems with respect to the warranty counts. We're talking here about one cutter that had a warranty, yet in the verdict form they could find both on express warranty basis and an implied warranty merchantability against two parties, Popco and Bauer, and they awarded separate amounts. I think in one warranty count they awarded $100,000 against Popco and then $400,000 against Bauer. Right, this doesn't make any sense. It doesn't make any sense. But who prepared this verdict form? Did the judge prepare it? Your Honor, I have the citation because, frankly, I was wondering the same thing, and counsel's response was absolutely right. It was basically agreed to by all parties, but I'll give you the cite. In the first trial, in the transcript, it's volume 7A, page 1443, and this is when the judge's clerk says, here's the verdict form. Are there any questions or revisions? And then it's discussed at pages 1505 through 1512, and it was acquiesced in by all parties. I think once the verdict came in after the first trial, I think everyone realized it's a mess. Not only did they not follow the instructions on the equitable adjustment, but the warranty claims are all over the board. Why? Well, even the breach claims were submitted incorrectly to the jury because Bauer's interests are aligned completely with that. Is it Pilico or Pilico-Pilico? I pronounce it Pilico. But Pilico-Pilico, that's just the American contracting agent for Bauer. Yes. Wholly owned subsidiary. So they just execute the contract on behalf of the foreign manufacturer. They were the leasing agent. They were an agent. And, Your Honor, in the second verdict form, at least there was just one party listed as giving the warranty, and that was Pilico, although the jury did not find that there had been a breach in that. There was only one warranty claim, and it involved Pilico only, not two. So that was one thing that was corrected. Also, in the second verdict form, it made it clear that the breach of contract brought by SSI, based upon their allegations with respect to the cutter in the warranty claim, there couldn't be more damages than just one amount because they were essentially the same. Right. They corrected that, and so at least it made some sense the second time. The jury was actually instructed the first time and the second time that both parties agree there should be an equitable adjustment to the round. They left it blank. Now, what about the question of the age of this machine? Yes. So the machine didn't work perfectly, is that correct? Yes, I think that's true. But the cause was never discovered? Specifically, Your Honor, when the machine was delivered, they commissioned the machine, the cutter, and all of the parts in October 2006. There were representatives of SSI and representatives of Bauer, and this was covered in Mr. Stocker's testimony. All the parts were commissioned. SSI was satisfied that they received what they had rented. Bauer tested it. There was a test section that was done prior to the signing of the contract. Between October 19, 2006 and December 6, there was a test section that was done that was actually required by the Army Corps of Engineers, but that was before any contract was signed. It was after the test of the cutter that SSI actually signed the contract on December 6, so they knew what they were getting. They had been commissioned. Well, did they know it was old? They said in their testimony that they did not. The testimony was that our person who was there said it was brand new, it looked brand new. And also, I think to Judge Hamilton's question, we had a witness, Mr. Berger, who went through this betronic that looks at how much time was spent on the job. It's a component of the cutter itself. Prior to 2006, there had been six hours, six hours logged on that cutter. So is that the quantification of the substantial use over the two years? I wouldn't use the word substantial, but yes. It sounds like a car that's been test-driven by a few other folks first. Precisely, and there was also testimony that the jury could have weighed that said that the cutter may not have even been operational, but it had been turned on, and the software would indicate that it was turned on for this period of time. It seems very strange that you'd have this expensive machine just sitting there for two years. Isn't that odd? I don't have an explanation for that, Your Honor. I do know in response. Couldn't it rust or something like that? Well, in response to your question earlier, in the rental agreement, which is part of the record, it indicates that the cost is about $1.8 million with its various parts. So when it was delivered, it was assembled. It was commissioned. It was used. It was used for over 4,000 hours. That was the testimony. It completed the work over this 26-and-a-half-month period. SSI received $16.3 million from the Army Corps of Engineers for this project. They had originally bid nine. So they got paid for the cost overruns associated with the delays? Yes, Your Honor, because as you know, originally in their bid, they had said nine months. Now they blame it on us, but the fact is they were paid $16.3 million even though there was a liquidated damages clause, which came out at trial in the Army Corps of Engineers contract, which they could have exercised for the delay, and they did not. So they were paid for this additional time. So the record, the evidence that the jury had was that, yes, there were some problems, and, yes, it didn't work on certain days, and therefore we're going to give an equitable adjustment. But the source of these problems was never identified? There was an expert that testified on behalf of SSI that said there were problems with the gearbox, the drive unit, the gauges hadn't been set properly. We had a person who testified who said that didn't cause a problem, that it was misuse of the product, that there were these heavy boulders that they hadn't expected, and that caused a delay. There were weather delays. There was a lot of evidence both ways with respect to the issues. And quite frankly, the evidence that was given by SSI was that this cutter didn't operate on 120 days. Now, we had counter evidence that said it was only attributable to problems with the cutter for 11 days. But the jury picked the SSI witnesses' time period, and they adjusted the amount we were owed for rent because they picked 120 days. In fact, to the letter, they figured out what the rental price was, divided it by 30, how many days they were down, and then they subtracted that from the verdict. And so we believe they did their job. If I could take you on a quick tangent, Mr. Eden, on that point. Sure. One of the issues in your cross-appeal is the denial of costs. Yes, sir. Could one reasonably say that even though it feels to the parties as if your side won the second trial almost completely or completely and slurry systems lost, could one reasonably say that the slurry system side prevailed on the equitable adjustment issue? Yes, they did. If that's true, and you've got, in essence, mixed results, would that justify denial of costs? Your Honor, it could. I know that is not the biggest issue before us. No, I understand. But it is one that you've raised in your cross-appeal. It is. The basis that Judge Keyes gave was because it was a close case, and he was referring to the first verdict versus the second verdict, and that was really his sole basis. We believe the costs should have been allocated, and again, it's not a major issue. We did cross-appeal on it, but we thought that we should have been given costs, and we also were looking at statutory interest. Why do you think the contract said that this cutter had to be new? Your Honor, what happened was the rental agreement that we had sent did not have that wording in it. SSI hand-wrote in the word new and then sent it back, and they wrote that in December of 2006 after they had used it for six weeks. So there was ambiguity in front of the jury as to, well, are they suggesting it had to be new as of that moment, because obviously it had been used for six weeks. There was a question about had we agreed to her writing in the new because it was not initial. So this issue of whether it had to be new or not was actually raised more in the post-trial motions that we were somehow trying a different case the second time around, and we couldn't do that. In the first case, the issue of whether it was new was raised and discussed by our witness, who said yes, it was brand new, and then they challenged it. And the other thing, Your Honor, on this new question, there was never any evidence given by them that because it was not new, here are our damages. Their evidence was, well, it didn't work for this reason or for that reason, but it wasn't because it wasn't new, because these last for a while. There wasn't any evidence that, well, maybe if there was rust on the wheels, that caused the damages. So that wasn't the theory of breach that was tried in either case? No. In the second case, Your Honor, they tried to make it because they had handwritten the word new in and because there was evidence to this platonic that maybe it wasn't new, that somehow they should be entitled to a directed liability, directed verdict, excuse me, liability, and then we'll determine damages based on it wasn't new. That's the only time it really came up. They did not put down evidence whether it was new or not. They were trying to rely on this platonic that had six hours in 2004. So we believe that Judge Key's decision to go forward and with the second trial vacate the first trial was proper. He could do it under Rule 59D on any basis that the parties could have raised, and we would have raised a number as we indicated. So then we would have had a second trial, and we believe the second trial that the jury reached the right result, and we expect that we would ask that this verdict be affirmed and that you will stand on our briefs with respect to the cross appeals. Thank you. Thank you, Mr. Aitken. Mr. Peck, let me ask you, these cutters, how many cutters are there? Well, I believe there are 40 of these made by Bauer. I don't know how many by other manufacturers. Mr. Stocker, who put- What would it mean to have a brand-new cutter? How often are they made? I don't believe they are often made, and- Pardon? I don't believe they are made often, but the query system- What would you have done if they said, look, there aren't any new cutters. They're not made every week. There's nothing brand new. They're only old. What would you have done? You'd still be stuck. You'd have to buy a cutter, right? Well, perhaps we would have negotiated different terms then because, again, because slurry systems is in the business of building these slurry walls, they were looking to, if they could find a cutter that could work reasonably, purchase it, and the agreement was built around that. But that has nothing to do with- That need have nothing to do with when it was built because new things can be defective just like old. Why would you want a new product rather than something that had been tested and found to be in good shape? Why does someone- That it was produced a day before? What does new mean? You mean unused. What if it was made 10 years ago and it's never been used? That's fine? That might have been fine. No, it wouldn't be fine. The fact of the matter is- You wouldn't want to have something that was very old and was just sitting in a warehouse. No one had ever bought it. No, you'd be very suspicious of that. We would, and that's one reason to do the test section. But, you know, just as someone prefers a new car, which, of course, you pay a higher price for than a used car that may be reliable, this was the deal that they made. It was negotiated in advance- These are not like new cars, old cars. I'm sorry? These are not- These cutters are not like new cars and old cars. Except that you're willing to pay more for a new one than you are for a used one. I very much doubt they're made frequently. And they're probably all old. And if they're new, they could be quite defective. So did you test it when you got it to make sure it was okay? Well, when it arrived, it was Bower's employees that set the settings and tested it and walked everyone through it. And the employee who did so, who had worked on more than 20 of these cutters all over the world, testified that he assumed it was new, but he didn't know whether it had just merely been repainted. But the issue is whether it's in good working order rather than whether it's new, isn't it? It is worth more if it is new. Pardon? It is worth more if it is new. Why? Well, because, again- What if it's a month old? A month old would not have made a difference in- I know, so new isn't even the car. You don't even have a definition of new. You don't know what new is. You say one month, it's still new. One month old, it's new. What if it's three months old? If it's unused, it's still new. Four months. I mean, it's ridiculous, right? Because there's no definition of new. Again, you know, if it's recent vintage and unused, then it would have satisfied the contract terms which were negotiated before the word new was written into it. Could you address what Mr. Eden told us about this having been used for six hours? We don't have with us the record site that shows that it was longer than six hours, but we believe that is inaccurate and that was significantly more than six hours. So we're supposed to find that somewhere ourselves? I apologize. I did not realize that that would come up an issue. Okay. Well, thank you. Thank you, Mr. Pack. So we'll hear from Mr. Roard. If the panel has any questions relating to the Miller Act issues, I'd be glad to answer them. Otherwise, I will stand on the argument presented by Mr. Pack. Thank you, judges. Okay. Thank you very much. And thank you.